Our first case this morning is Baird v. The Army. Got her? Mr. Prue? Yes, Your Honor. Family Support Council. It's been my honor to represent Pam Baird, an individual who served for 23 years with a spotless record prior to being dismissed in 2006. The first point that I would emphasize is that she was dismissed from a test-designated position, a so-called DDPD, which was one that was designated. And the very documents that designated her position, however, specified that she would be, if something happened, though she might, based on a violation of the designation, she might find herself in jeopardy of no longer having a test-designated position. Then the precise words of the document that informed her of the random drug testing and telling her that she was in a designated position states that if she either refused to comply with the urine sample requirement or if she flunked the test, quote, you may be reassigned, demoted, or separated according to applicable regulations. Isn't that what the document says? Yes, Your Honor. What were the applicable regulations? The applicable regulations were found on page 159 and 162, the two pages most pertinent. The entire agency had regulations of 157A through 165. 159, you say? 159 and 162 are the two most pertinent pages. And I have also put those in detail in the brief itself. But at 159 is paragraph 6, which is the paragraph that would seem most applicable. This is one that talks about unauthorized use of alcohol, drugs, and controlled substances. Isn't that a table of penalties? Yes, that is part of the agency regulation. If you look back to 157A, that's appendix A, table of penalties. The regulation is beginning on page 157. Well, that's an extract from the regulation. But the regulation, well, she was, by the parameters of the paper where she was provided, she was being told that she would be treated according to agency regulations. And that clearly didn't happen in this case. Well, I don't understand that point because it seems to me that the table of penalties here is a guideline. It's not binding on the agency. It is. We've had a similar issue in the Farrell case. And there's no problem with exceeding the table of penalties, right? Right. I thought your point was somewhat different, that it was that if the agency is going to have a zero tolerance policy, it has to give notice, and it didn't give notice here. Right. Exactly so, Your Honor. But, you know, and so we're kind of, but this addresses, I think, Senior Judge Kleffner's question, I hope. Page 157A does say that there should be a reasonable explanation to distinguish why the penalties are set apart, a reason that can be explained to third parties in the penalty review. And, of course, as Judge Stein correctly points out, if you've got a zero tolerance policy, then, you know, you really don't need to explain anything. You just decide and off you go. And I take it your desire to have compelled the testimony of Colonel DeRuvo was because you wanted to try to ascertain whether, in fact, there had been a zero tolerance policy in effect. Is that right? Well, that is correct, Your Honor. And we had, we did, as the records indicate, we did have an interview with her. She's the only person we interviewed after we had the late disclosed emails. All other interviews, although agency counsel had these printed out since December, we can tell that from the bottom of the pages. They were printed out, some in December, some in June. The latest ones, well, there were some on 11 July, and then the very latest ones, including Inez Neely's 5 December email, was printed on the day it was given to us. So all these interviews are being conducted. You know, we have a set budget. You know, depositions are fine if you can afford a court reporter. But our technique was to tape record them and do it telephonically. That was not possible. The agency no longer cooperated on that as to the hospital commander. And so here we are conducting these interviews in good faith, not knowing what the agency did know is that they had all these emails. And had had them since apparently December. So, you know, the—I hope that's responsive, Your Honor, to the point. What did you want to—you asked to call Colonel DiRuvo as a witness, and the administrative judge refused to allow that. Right. I think it would have cemented the position that we thought was most important to the case, specifically that, you know, we had a lot of—as facts became more apparent to us, I think they're very apparent today, but they became in—they came in pieces. And we felt that the most important piece would be to hear from the commander herself and let her explain what had happened. There's also in the record— But what were you trying to show with her testimony? Were you trying to show that they had a zero-tolerance policy? Yes. Were you trying to show that Commander DiRuvo had ordered, what is it, Major Blackmun? Yes. To separate her? Is that what you—are those the things that you wanted to do? Your Honor, it's our belief that she would have said that she knew about the email that was sent. She knew about the communications with MedCom. She was totally aware that, you know, six out of seven— Where does that get you? Stop for just a second with the telecoms with MedCom. This is the—who are the participants in those emails? Inez is one and Ernie is the other, right? Ernie, yes. And the bottom, bottom line of all that was Ernie saying, well, we've had seven cases before and we fired six people and we didn't fire one. Right. And they took that as a precedent. She was asked—the beam counters at the personnel level were asking the command, Colonel DiRuvo, for a policy. Do you have a policy on this? And what they got was an answer to the question. We don't have a policy, but since MedCom has fired six or seven, we feel compelled to fire a spare. But I'm still trying to find out what it is that you wanted to ask Colonel DiRuvo. Did you want to ask her, did she require termination? Yes. And you wanted to ask her about whether there was, in fact, a zero tolerance policy? Yes, Your Honor. Was there anything else? Was that it? Well, we wanted her to explain if she denied that there was a zero tolerance policy, we wanted her to explain how it is that her name was being used in a manner that she had to know about. Everybody's getting these emails. Even Beth Williams, who is not an addressee, has in the record her copy of 5 December evening. So this was going out far and wide in the name of the commander. So either she was, you know, certainly the commander. You haven't uncovered any email traffic between Colonel DiRuvo and Major Blackman, right? No. And Blackman testified that she had not talked with DiRuvo about the Baird case. She did say that, yes. And Blackman testified? Yes. So you could cross-examine her if you wanted to on that point. Right. But there was, you know, and I don't know if this cuts in favor or against my argument, but I think, you know, for Major Blackman, given the way military orders are given and executed, and we've cited the Title 10 of the U.S. Code, there's no need for her to talk. She's gotten a communication. If the command has been issued in the name of the commander, and it had, and it reaches Majors, Majors are about four levels below that Colonel. Well, the administrative judge was willing to grant, for purposes of argument, that DiRuvo initiated the removal proceedings by saying start drafting the papers. Right. And then the administrative judge says that's fine, and then Blackman and her underling pick the ball up, and then they process the removal that DiRuvo is no longer involved. Right. Well, if that's correct, what's wrong with your client being removed by Blackman, who testifies that she made the decision, even though the boss, DiRuvo, had said, this is what I think you should do? Well, I think you have to look very carefully at that 5 December email, because it says, it does say, based on the commander's decision, and what Inez Neeley is telling people, and she testified, what she was telling people is back away, the commander's made the decision, and so if you want to, and look at the message. Which decision, the decision to initiate proceedings or the decision to terminate? Well, at that point she was saying she's made her decision. She doesn't specify in the email. She testified that essentially she believed the commander directed her removal. Well, Sauer knew. Is she in that sentence being Blackman? No, Inez Neeley. Neeley? Yes, Your Honor. On page 49 of her brief, we quoted in bold and underlined in italics. Well, what was Neeley's role, other than as an information gatherer? Well, she was de facto the voice of the commander. In the military, orders are issued by commanders, or there's even a name line where they're issued in the name of the commander, and that's what this person was doing. She said as much. She was very forthcoming when we finally got her under oath, and although she did only print out her 5 December email on the day of disclosure, although she printed others out in December, we think she was in essence the VOC, the voice of the commander in this case. Thank you. Mr. Pruitt, would you like to preserve your rebuttal time? I would like to preserve your honor, if I may. You may. Ms. Bora? Mr. Bora? Good afternoon, Your Honors, and may it please the Court. This Court should affirm the decision of the American Citizens Protection Board that upheld— Suppose that they were successful in showing that Colonel DeRubo ordered the termination. Would that have been improper since Colonel DeRubo was not the deciding official? To answer your hypothetical, no, Judge Dekke, it would not have been improper because the record clearly reflects that the actual decision to remove her was made by Major Blackman. But you're not accepting my hypothetical. If, in fact, the record established that it was not Major Blackman who made the decision, but Colonel DeRubo who was not the deciding official, would that have been improper? I suppose that would depend, Your Honor, on whether or not the record also indicated as to whether or not Colonel DeRubo's decision was based upon an appropriate analysis of the Douglas factors or any other relevant considerations regarding Ms. Baird. You're suggesting that if it had been based on an analysis of the Douglas factors, that Colonel DeRubo could have ordered the deciding official as to what decision to make? Perhaps at that point, if Colonel DeRubo was not the deciding official, then it may have been inappropriate. Inappropriate. Correct, Your Honor. If Colonel DeRubo had issued an order or made a statement down the line saying, I just want you to know we have a zero tolerance policy here on drug use, no exceptions, zero policy, then could the deciding official be deemed to have independent authority to decide the case? If the commanding officer had said the answer has to be termination, zero tolerance? If that was the case, Your Honor, then no, the deciding official would not have been an independent adjudicator of Ms. Baird's decision. It would have been simply the hospital's policy. And if DeRubo had been called to testify, she could have been asked that question, right? Did you give the order? She certainly could have been asked that question, Your Honor, but there was nothing in the record up to that point that would have led the administrative judge to think that. What about the email traffic between Ernie and Inez? Did anyone know about that? Absolutely, Your Honor. That email traffic was in the record, and that email traffic expressly states Ms. Neely went to Mr. Morales and asked if, in fact, there was a policy with regards to— And he said there's not. Correct, Your Honor. But he said there have been seven MedCom instances of positive drug use, and all were removed except one. Correct, Your Honor. But what he also said in that email was that there's nothing in the applicable regulations that requires removal in an instance like this. He said what he said. Let's go back to page A168 where we've got the Department of the Army's memorandum for Ms. Baird giving her notice of the random drug testing policy and telling her that she could be reassigned, demoted, or separated if there was a violation of the policy. Separate according to applicable regulations. What are the applicable regulations? I believe the applicable regulations, Your Honor, are—the best answer I can give is the Army's general regulations. Are there any specific regulations that deal with random drug testing? I don't think— Correct, Your Honor. Correct, Your Honor. There are not, Your Honor. Just to clarify— So Ms. Baird had no notice. She didn't know whether a single use of marijuana and a single drug test would qualify her for the leniency that the one person got out of the seven that got caught before, right? Excuse me, sir. She did have the notice of proposed removal which stated that the proposing officer believed that this offense was serious enough. Well, but the authority—the authority relied on in the notice of proposed removal was Regulation 690-24, Item 13, right? Right. And when we look at that, we find that has no relevance to this case, right? Because it deals with introduction of a controlled substance into a worker area. And there's a concession by the government that Ms. Baird didn't do that. That's correct, Your Honor. So what relevance—what's the authority in the notice of proposed removal for removing? Well, Your Honor, it can still refer to the table of penalties which, though does not speak directly to Ms. Baird's offense, does provide a guideline for the government to use when determining an appropriate penalty. We certainly don't deny that Ms. Baird specifically— Well, the overall guideline is unauthorized use of alcohol or drugs, right? Correct, Your Honor. And that—the—you—on your third offense, you might be subject to removal. For the first offense, which would be Ms. Baird's problem, right, the recommended table of penalty is a reprimand to a five-day suspension. Well, Your Honor, actually, I believe you're looking at paragraph 6 on page 137. Yeah, uh-huh. Right. The actual specific offenses in the column 1 to the right only deal with alcohol usage. 6C actually says see paragraph 13 for other drug-related offenses. If you turn to paragraph 13— The unnumbered 13, right? Right. The unnumbered 13, correct, on page 140. Right. That deals with the introduction of—the offense is introduction of a controlled substance to the work area, right? Correct. And, again, this doesn't deal directly with Ms. Baird's offense, but the recommended penalty here is anything, for first offense, from three-day suspension to removal. Now, because Ms. Baird was in a test-designated position and because Ms. Baird was—had signed this memorandum saying she understood that remaining drug-free was a condition of employment, and because Ms. Baird's job— She would have understood that if what came to pass came to pass, i.e., the failing of the drug test, she would be subject to reassignment, demotion, or separation. Correct, Your Honor. But she has no clue, right, as to what it takes to be reassigned as opposed to separated or demoted as opposed to separated, right? Correct, Your Honor. The memorandum doesn't say if you only use smoke marijuana once, that's, you know, one penalty or two. And the deciding official in running through the Douglas factors didn't address the question of why it was she wasn't either reassigned or demoted as opposed to separated? No. It didn't talk about whether there was some position in the hospital where she could have been put to work, at least for a period of time, where she would have been separated from the veterans that were needing counseling? No, it simply stated the justification for her removal. Major Blackman's testimony did—she did testify before the Board, however, that she considered other potential penalties, including reassignment, and determined that given the nature of Ms. Baird's employment and the offense here— Correct, Your Honor. But a policy—what's a no-tolerance policy, particularly a no-tolerance policy that seems to leave discretion for a deciding officer to do otherwise in extenuating circumstances? I'm not sure I can answer that. Well, all we have from Colonel DeRuvo at the maximum is a no-tolerance policy, right? That isn't the colonel giving any orders to anybody to be fired, right? No, it's not, Your Honor. As a matter of fact, we have on the record evidence that the colonel has not done that because others have not been fired. Correct. So the discretion remained with Major Blackman, didn't it? Absolutely. So our only job here is to determine whether Major Blackman abused discretion in reaching the decision to fire somebody for failing a drug test, right? That's correct, Your Honor. Which is almost a universal policy government-wide, isn't it? For the most part, it is, Your Honor, yes. Thank you very much. But what I understand is bared to be argued is that she had the right to examine Colonel DeRuvo as to whether, in fact, he gave an order to have her removed and, in fact, was applying an automatic termination policy. So it's quite correct that if they did consider the Douglas factors, they didn't have an automatic policy. If Major Blackman made the decision, there's nothing wrong there. The problem is that weren't they entitled to examine Colonel DeRuvo to find out whether that, in fact, was the case or not? I don't believe they were, Your Honor. Why not? Because all the evidence up to that point, up to Ms. Baird, requesting Colonel DeRuvo's testimony, none of that indicated that Colonel DeRuvo had ever made any sort of order or stated that there was. Well, there's an email that suggests that he made the decision. There is that. And they certainly advised the administrative judge as to their theory of the case as to what Colonel DeRuvo had done, right? That's correct, Your Honor. That December 5th email in which Ms. Neely says Colonel DeRuvo has made her decision, one, it doesn't specify exactly what the decision is. And when Ms. Neely was questioned about that for the board, she said that she had not spoken directly to Colonel DeRuvo. Her information with regards to what Colonel DeRuvo had directed came from a Colonel Sauer. So what's the standard for calling a witness? They had a theory of the case, which had some support in the emails. They wanted to call Colonel DeRuvo to question her. We'd have to find that the administrative law judge abused discretion, right? That's correct, Your Honor. And the administrative judge knew, had heard Blackmun's testimony that the colonel wasn't involved at all. That's correct as well, sir. It's pretty hard to say there's an abuse of discretion there, right? When there was an inquiry as to who made the decision, the officer who said they made the decision stood up and said, it's me, and I'm here. You can cross-examine me all you want. That's correct. Thank you. As well as the proposing official who also said, I never received any sort of order that said I had to propose removal or that Colonel DeRuvo had placed any sort of pressure on me. It's hard to find an abuse of discretion there, isn't it? That's correct, Your Honor. I don't understand that last answer. I thought the administrative judge found that Colonel DeRuvo had, in fact, ordered the proceedings to be initiated. Essentially, Colonel DeRuvo had said that draft this letter with regards to proposing removal. But Sergeant Phillips said it was his decision to sign it, and he did not feel any pressure based upon the fact that Colonel DeRuvo had said that, you know, previously this is how it's been done. We've proposed removal in situations like this. He stated that it was still his decision to actually sign that notice of proposed removal, and he felt he could have done otherwise if he thought another penalty was more appropriate. Moreover, Lieutenant Sauer was the only person who testified that they actually spoke with Colonel DeRuvo and testified that Colonel DeRuvo never ordered Ms. Baird to be removed, nor did she ever state that there was any sort of zero-tolerance policy. Instead, Colonel DeRuvo, according to Colonel Sauer's testimony, simply said that CPAC, the Civilian Personnel Action Committee, can go ahead and notice a proposed removal. Ms. Blackman's testimony… How do we know whether the discretion to which the presiding judge referred, which certainly seems to be present if in the past there have been seven offenses, six were fired, one person, some was saved, how do we know whether that discretion gets exercised by DeRuvo or by, in this case, Blackman? I mean, if the signal had come down from on top, remove, remove. And then everybody down below said, yep, we've reviewed the facts and we did the removal ourselves. Well… That would be impermissible as well if it was the boss, DeRuvo had in essence said, this is not a case in which we're going to cut her any slack. That would be, Your Honor, but again, Ms. Blackman's testimony stated that she considered Ms. Baird's case… In fact, she issued what she called a deciding checklist where she identified everything that she considered in coming to her decision to remove Ms. Baird. Nothing in that deciding checklist even indicates that she considered the fact that at another hospital, six out of seven… Right. There's nothing in Blackman's testimony saying that she ever gave any thought to the possibility of giving Baird another job. In the actual decision, no, there's not, Your Honor, but Major Blackman did in fact testify that she knew that was a possibility, that she was certainly allowed to make such a determination that reassignment as opposed to removal would be more appropriate, but that nonetheless… Well, Blackman wouldn't have known whether there was a position available, right, necessarily? Well… The commanding officer would know whether there was a position that was available? I'm not sure Colonel DeRuvo necessarily would have known. There would have been other persons who would have made such a… But in Ms. Baird's written submissions to the notice of proposed removal, she presented letters that had stated that there were other positions available and other persons who would have been willing to take her. I see that my time has expired. Thank you very much. Mr. Fore and Mr. Proulx, you have about four and a half minutes remaining. Thank you, Your Honor, I'll try to be concise. I think perhaps the most significant point that I would make at this point is that, in fact, nobody at Fort Leonard would ever cut anybody any slack for this issue. It was Medcom who had six out of seven. That's why Fort Leonard was going to Medcom, you see. And so the personnel people were looking to the commander for a policy, and what they got was a decision, perhaps labeled a policy, but it was a decision as to this particular person. But I thought it was the major who said he made the decision. Policies are different from decisions, aren't they? Well, she said that she made the decision. Are you aware, by the way, of any government agency that has anything other than a zero-tolerance policy on drug use and drug testing? Well, it's – yes. You are? Yes. If you look at the actual table of penalties in this case, we see that this agency has a multitude of different ways they can treat people. One, because a first offense is not a termination offense, you see. So, yes, I am aware of that. And I would also point to – Well, all you're saying is you're defining a zero-tolerance policy to allow some discretion, which appears to be the case in this case as well. Yes, you're right. But the zero-tolerance policy, I'm not aware of any government agency who would say they didn't have one. Are you aware of one? Well, I do believe the government agency – Well, sure, and drug usage is not being condoned, and neither is Ms. Baird saying this is a good thing. And unlike the agent in Dale, she's saying, you know, a bad thing happened, and I want to take responsibility for it. I'm not trying to have the law cover up for me. But if you look on page 483, what did Major Blackmun say? What was she quoted as saying on the 29th of November email from Bet Williams? Major Blackmun said Baird is a good, loyal employee. This is 29 November. This is the day before the email goes out. I don't know where this made up her mind. Said Baird is a good, loyal employee. She'd rather not lose her, but if that's the policy, then we'll separate her. The policy. If that's the policy – if that's the decision in this case, in other words, the personnel people are saying we need to find out what your policy is, Commander. Commander says, nothing written, but through her agents, VOC, a voice of the Commander, co-read, if you will, the decision. They know there's a policy, but they also know that there's been some leniency in at least one out of seven situations. Never at Fort Leonardwood. And so this is being announced at Fort Leonardwood, having determined. And mind you, in Douglas number six, there's supposed to be some – normally the person being dismissed is saying, hey, what about this person over there? What about that person over there? All of this was heard by the administrative law judge, right? And so we've got to deal with an abuse of discretion. I don't think he read a document submitted. I don't think he understood what was going on. I don't think he listened to – and it was all done by teleconference. I don't think he – and so – So you're attacking the procedure of the administrative law judge, thinks that there was a grave abuse of discretion here. I think there was an abuse of discretion. Yes, I do. And I think I've made that point. And in a very tactful way, I think I put that in the record of the proceedings. I think that's my duty and my bond. And I do think that happened. And I think this Major Blackman, the notion that she's a nice lady in charge of a group of people. But when a major in the Army gets a directive, VOCO or otherwise, from a commander that says, hey, the decision's been made. And again, you have to look back at the 5 December email. It doesn't just say the commander's made the decision. It says the commander's made the decision what action she wants to take. And CPAC is working in that direction based on the commander's decision. And the only folks that need to be involved in this are – and then she says, you know, anybody that wants to help her, butt out. If you have – and then she goes on. If nursing or Colonel Merakian want to discuss it with the commander, you see. So it's not just butt out. And it's not just she's made her decision. If you want to change this direction, you need to get into the commander. And she's already told them, butt out. Leave it alone. And that's on page 3. And that's before we put all of this police – Which page? 480, Your Honor. Thank you, Mr. Crew. Thank you, Your Honor. Our next case is Avera v. HHS.